UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MR. and MRS. S., on behalf of B.S.,
and MICHIGAN DEPARTMENT OF
EDUCATION,

          Petitioners-Appellees,

                                   File No.  5:06-CV-53

v.

                                   HON. ROBERT HOLMES BELL

ROCHESTER COMMUNITY SCHOOLS,

          Respondent-Appellant.

_____/

**O P I N I O N**

       This matter is before the Court on Respondent-Appellant's appeal from the Michigan

Department of Education's determination about 20 U.S.C. § 1415(f)(1)(B)(i)(III) and on the

Michigan Department of Education's counterclaim for declaratory and injunctive relief.

Pursuant to the Court's order of June 23, 2006 the parties have filed briefs addressing the

merits of the case.  The Court is presented with two issues.  First, did the Michigan

Department of Education correctly interpret § 1415(f)(1)(B)(i)(III).  Second, did Rochester

Community Schools violate § 1415(f)(1)(B)(i)(III) on October 25, 2005 during the

preliminary meeting with Mr. and Mrs. S.  For the reasons that follow, the Michigan

Department of Education's interpretation of § 1415(f)(1)(B)(i)(III) is incorrect and Rochester

Community Schools did not violate § 1415(f)(1)(B)(i)(III) on October 25, 2005.

I.

Mr. and Mrs. S. disagree with Rochester Community Schools ("Rochester") about the appropriate education of their child, B.S.  The appropriate education of B.S. is not before the Court, but the matter before the Court does arise in the context of the dispute about the appropriate education of B.S.  Mr. and Mrs. S. disagreed with certain evaluations of B.S. made by Rochester and requested an independent educational evaluation. 20 U.S.C.A. § 1415(b)(1) (West 2000 & Supp. 2006).  Rochester denied the request and  initiated a due process hearing pursuant to the Individuals with Disabilities Education Act ("IDEA").  Thereafter,  as prescribed by § 1415(f)(1)(B) a preliminary meeting was scheduled to take place between Mr. and Mrs. S. and Rochester on October 25, 2005 at a Rochester middle school.

On October 24, 2005, Mr. S. contacted Rochester's attorney, Michael Bevins, to determine who would be participating in the October 25 meeting.  Mr. Bevins then indicated that he would not be attending the meeting because Mr. and Mrs. S. would not have an attorney attending the meeting.  On October 25 at around 8:30 a.m.,  Mr. Bevins arrived at the middle school to review documents, train the district personnel on the "resolution session" process and if an agreement was reached to provide assistance in drafting a written agreement.  Mr. and Mrs. S. arrived at around 10:00 a.m. and noticed that Mr. Bevins had signed into the building earlier that morning.  Mr. and Mrs. S. then met with Rochester personnel, but not Mr. Bevins.  During the meeting one of the Rochester personnel recorded

2

the "agreed upon language on a laptop computer." (Oakland Schs. Investigation Report of the Compl., docket #9, at ¶ 1(d).)  An "initial agreement" was reached at around noon. (*Id.* at ¶¶ 1(g), 6(c).)  The Rochester personnel then left the room with the laptop on which the agreement had been recorded.   The Rochester personnel brought the laptop with the agreement to Mr. Bevins, at which point the agreement was transferred to Mr. Bevins' laptop. Mr. Bevins then retyped the agreement and added legal language.  (*Id.* at ¶¶ 2(g-i), 3(b-d), 5(c-d), 6(c), 6(f).)

After waiting in the room for forty-five minutes, Mr. and Mrs. S. left the room to locate the Rochester personnel.  Mr. and Mrs. S. found the Rochester personnel conferring with Mr. Bevins.   Mr. and Mrs. S. then unsuccessfully attempted to contact their attorney. The Rochester personnel, without Mr. Bevins, then reviewed the agreement as drafted by Mr. Bevins with Mr. and Mrs. S.  The parties then completed two more revisions of the agreement.  After completing the second revision at around 2:00 pm, the parties signed the agreement.  (*Id.* at ¶¶ 1(q), 4(b), 6(a), Ex. H.)  Mr. and Mrs. S. later faxed the agreement to their attorney, who advised them that "they had given up the right to an Independent Education Evaluation." (*Id.* at ¶ 1(r).)  Mr. and Mrs. S. then confirmed this understanding with Mr. Bevins.  Upon discovering this, Mr. and Mrs. S. exercised their right under § 1415(f)(1)(B)(iv) to rescind the agreement. (*Id.*, Ex. I.)

Mr. and Mrs. S. then filed a complaint with the Michigan Department of Education ("Department of Education" or "Department") alleging that Rochester had violated

3

§ 1415(f)(1)(B)(i)(III). *See* MICH. ADMIN. CODE. R. 340.1851 (2006).  This complaint is

known as a "Part 8 Complaint."  The Department of Education referred the Part 8 Complaint

to the Oakland Intermediate School District ("Oakland ISD") for investigation.   On

January 10, 2006 the Oakland ISD issued its report, which found that Rochester had violated

§ 1415(f)(1)(B)(i)(III).  (Oakland Schs. Investigation Report of the Compl. 7-8.)  The Office

of Special Education and Early Intervention Services of the Department of Education

reviewed the Oakland ISD's report. *See* MICH. ADMIN. CODE. R. 340.1852 (2006).  On

February 10, 2006 the Department of Education adopted the conclusion that Rochester had

violated § 1415(f)(1)(B)(i)(III). (Letter to Dr. John M. Schultz, docket #9, at 1.)   The

Department of Education determined that §  1415(f)(1)(B)(i)(III):

> prohibits the use of an attorney by the district during initiation to completion
> of a [resolution session meeting ("RSM")] when a parent of an eligible student
> is not accompanied or represented by an attorney "first" during initiation to
> completion of an RSM.

(*Id.* at 1.)  The Department of Education directed Rochester to take the following corrective

action:

> [t]he district shall inform the pertinent RSM participants and the district's
> attorney that it is not permissible to meet or communicate with the district's
> attorney after initiation to completion of a RSM unless the parents of an
> eligible student are accompanied or represented by their attorney first.

(*Id.* at 2.)  The Department of Education also directed Rochester to take certain steps to prove

compliance.  In Michigan an administrative decision may be appealed to a state court.  MICH.

CONST. art. VI, § 28;  MICH. COMP. LAWS Serv. § 600.631 (LexisNexis 2004).   On

4

February 28, 2006 Rochester filed a claim of appeal in the Ingham County Circuit Court. (Claim of Appeal, docket #1, attach. 1.)  On March 17, 2006 the Department of Education removed the case to this Court and shortly thereafter filed a counterclaim against Rochester. (Notice of Removal, docket #1; Countercl. for Decl. and Inj. Relief, docket #5.)  Rochester filed a motion to remand the case, which was denied on June 23, 2006. (Order, docket #28, at 1.)  The parties filed briefs on the merits on July 24, 2006.

## II.

In their "Brief on [the] Underlying Matter," Mr. and Mrs. S. argue that the court lacks subject matter jurisdiction because the matter is not ripe. (Mr. and Mrs. S.'s Br. on Underlying Matter, docket #34, at 5-7.)  "'If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed.'" *George Fischer Foundry Sys., Inc. v. Adolph H. Hottinger Maschinenbau GmbH*, 55 F.3d 1206, 1210 (6th Cir. 1995) (quoting *Bigelow v. Michigan Dep't of Natural Res.*, 970 F.2d 154, 157 (6th Cir. 1992)). Ripeness requires a court to weigh three factors. *Adult Video Ass'n v. U.S. Dep't of Justice*, 71 F.3d 563, 568 (6th Cir. 1995).  First, a court must consider the likelihood that the alleged harm will ever come to pass.  *Id.*  Second, a court must consider "whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims." *Id.*  Third, a court must consider the "hardship to the parties if judicial relief is denied at this stage . . . ." *Id.*

Mr. and Mrs. S. argue that the dispute is not ripe because Rochester did not have a written policy regarding the preliminary meeting and Rochester's attorney did not inform Mr. and Mrs. S. of Rochester's interpretation of the resolution session prior to or during the meeting on October 25, 2005. (Mr. and Mrs. S.'s Br. on Underlying Matter 6.) As to the first factor, in the absence of a decision by this Court Rochester will be subject to compliance with the Department of Education's interpretation of § 1415(f)(1)(B)(i)(III) and the Department's ongoing compliance measures. (Letter to Dr. John M. Schultz 1-2.) Mr. and Mrs. S.'s argument focuses on the second factor. Though Rochester did not have a written policy regarding resolution sessions on October 25, 2005, the Court does have before it a detailed account of the events. (Oakland Schs. Investigation Report of the Compl.) Rochester also submitted a "Position Statement" to the Oakland ISD which explains Rochester's interpretation of § 1415(f)(1)(B)(i)(III). (*Id.* at Ex. J.) Therefore the Oakland ISD and the Department had an opportunity to develop the administrative record in consideration of Rochester's position. As to the third factor, if judicial relief is denied then Rochester will continue to be subject to the Department's interpretation of § 1415(f)(1)(B)(i)(III). In consideration of the three factors, the Court holds that this matter is ripe.

III.

## A.  Section 1415(f)(1)(B)(i)(III)

The "Individuals with Disabilities Education Improvement Act of 2004," among other changes, amended 20 U.S.C. § 1415 and became effective on July 1, 2005.  INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT ACT OF 2004, § 615, Pub. L. No. 108-446, 118 STAT. 2,647, 2,715-31 (2004) (codified as 20 U.S.C. § 1415).  The matter before the court concerns new a procedure added to the IDEA process by a subsection of § 1415.  The relevant part of § 1415 provides for a:

(B)  Resolution session.
(i)  Preliminary meeting.  Prior to the opportunity for an impartial due process hearing under subparagraph (A), the local educational agency shall convene a meeting with the parents and the relevant member or members of the [individualized education program ("IEP")] Team who have specific knowledge of the facts identified in the complaint--
    (I) within 15 days of receiving notice of the parents' complaint;
    (II) which shall include a representative of the agency who has decisionmaking authority on behalf of such agency;
    (III) which may not include an attorney of the local educational agency unless the parent is accompanied by an attorney; and
    (IV) where the parents of the child discuss their complaint, and the facts that form the basis of the complaint, and the local educational agency is provided the opportunity to resolve the complaint,
unless the parents and the local educational agency agree in writing to waive such meeting, or agree to use the mediation process described in subsection (e).
(ii)  Hearing.  If the local educational agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all of the applicable timelines for a due process hearing under this subchapter shall commence.

(iii)  Written settlement agreement.  In the case that a resolution is reached to resolve the complaint at a meeting described in clause (i), the parties shall execute a legally binding agreement that is--

 (I)  signed by both the parent and a representative of the agency who has the authority to bind such agency; and

 (II)  enforeable in any State court of competent jurisdiction or in a district court of the United States.

(iv)  Review period.  If the parties execute an agreement pursuant to clause (iii), a party may void such agreement within 3 business days of the agreement's execution.

20 U.S.C.A. § 1415(f)(1)(B) (West Supp. 2006).  The Court uses the term "resolution session" to refer to all of the procedures provided by § 1415(f)(1)(B).  The Court uses the term "preliminary meeting" to refer to subpart (f)(1)(B)(i), inclusive of clauses (I) through (IV).

## B.  Standard of Review for Agency Decisions under the IDEA

The Court must first determine whether the Michigan Department of Education correctly interpreted § 1415(f)(1)(B)(i)(III).  In the briefs filed before this Court, the Department of Education and Mr. and Mrs. S., have not proposed any particular standard of review or level of deference that this Court should apply in evaluating the Department's interpretation of the statute.  Rochester has proposed that this case should be reviewed under either the Michigan Administrative Procedures Act or the federal Administrative Procedures Act.  (Rochester's Appeal Br., docket #31, at 9.)  The Sixth Circuit has held that a federal court applies a "modified de novo" standard when a party seeks review of the "findings and decision made under [§ 1415(f) or (k)]" § 1415(i)(2)(A); *Burilovich ex rel. Burilovich v. Bd. of Educ.*, 208 F.3d 560, 565 (6th Cir. 2000).  The matter before Court did not come before

the Court through the procedures provided by § 1415(i)(2)(A), but the matter before the Court does involve a decision about, though not under, § 1415(f).   Additionally, the "modified de novo" review standard is based on the Supreme Court's interpretation of the relationship Congress created between state governments and the federal courts under the IDEA.   *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).   The Court finds that the "modified de novo" standard of review is the standard governing this case.

The modified de novo "standard of review stems from the Supreme Court's holding that courts must give 'due weight' to the state administrative proceedings."   *Burilovich* , 208 F.3d at 565 (quoting *Rowley*, 458 U.S. at 206).   The "modified de novo standard of review applies to both procedural and substantive matters."   *McLaughlin v. Holt Pub. Schs. Bd.*, 320 F.3d 663, 669 (6th Cir. 2003).   The modified de novo standard requires the Court to "make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings."   *Id.* (quoting *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001)). "The amount of weight due to administrative findings depends on whether the finding is based on educational expertise."   *McLaughlin*, 320 F.3d at 669.   Under the "due weight" framework, "[l]ess weight is due to an agency's determinations on matters which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation."   *Id.* at 669.   The matter before the Court is principally a matter of statutory construction.   Statutory construction is a matter for which "a federal court is just as well

suited to evaluate . . . ." *Id.* The part of the statute being construed involves the procedural requirements of the IDEA and not decisions about the education of children. Therefore, the construction of § 1415(f)(1)(B)(i)(III) is effectively reviewed de novo, because educational expertise has a minimal bearing on the construction of a procedural element of the IDEA.

## C. Statutory Construction

"'[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 126 S. Ct. 2455, 2459 (2006) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). "In statutory construction cases, 'the first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Fullenkamp v. Veneman* 383 F.3d 478, 481 (6th Cir. 2004) (quoting *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 450 (2002)). A court "may resort to a review of congressional intent or legislative history only when the language of the statute is not clear." *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 549 (6th Cir. 1999). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

This past summer in *Arlington Central School District Board of Education v. Murphy*, 126 S. Ct. 2455, 2458 (2006), the Supreme Court specifically addressed statutory construction under the IDEA. The IDEA was enacted pursuant to Congress's power under

the Spending Clause. U.S. CONST., art. I, § 8, cl. 1; *Arlington Cent.*, 126 S. Ct. at 2458.  "In a Spending Clause case, the key is not what a majority of the Members of both Houses intend but what the States are clearly told regarding the conditions that go along with the acceptance of those funds." *Arlington Cent.*, 126 S. Ct. at 2463.  A court must "view the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds." *Id.* at 2459.

The relevant portion of the statute provides "the local educational agency shall convene a meeting with the parents and the relevant member or members of the IEP Team . . . which may not include an attorney of the local educational agency unless the parent is accompanied by an attorney." §§ 1415(f)(1)(B)(i), (f)(1)(B)(i)(III).  The dispute about the construction of § 1415 centers on the meaning of "meeting" and "include."

"Meeting" is defined as "[t]he gathering of people to discuss or act on matters in which they have a common interest . . . ."  BLACK'S LAW DICTIONARY 1064 (8th ed. 2004).  "Include" is defined as "to contain as a part of something." *Id.* at 777.  The meaning of the statute based on these definitions is:  a "gathering of people to discuss or act" . . . which may not "contain as a part" an attorney of the local educational agency  ("LEA").

Another definition of "meeting" is "an assembly or gathering of people, as for a business, social or religious purpose." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1093 (4th ed. 2000).  A second definition of "include" is "[t]o take in as a part, element, or member. . . ." *Id.* at 887.  The meaning of the statute applying these definitions

11

is: "an assembly or gathering of people . . . for a business . . . purpose" . . . which may not "take in as a part, element, or member" an attorney of the LEA.

The import of these definitions is clarified by reference to the entirety of subclause (III). The subclause excludes the LEA's attorney "unless the parent is accompanied by an attorney" § 1415(f)(1)(B)(i)(III). "Accompany" is defined as "to go along with (another); to attend." BLACK'S LAW DICTIONARY, *supra*, 17. Thus, the inclusion of the LEA's attorney is conditioned on the parent having her attorney be physically present at the meeting. In the context of accompany, include means the physical presence, or the functional equivalent, of the LEA's attorney if the meeting is taking place in person. In the case before the Court, the preliminary meeting started with the meeting between Mr. and Mrs. S. and Rochester personnel on October 25, 2005 at around 10:00 a.m. Thus, it is clear that Rochester's attorney was not included in the meeting from 10:00 a.m. until around noon. These definitions leave unresolved when the preliminary meeting ended, if the meeting continued after noon and whether Rochester's attorney was then included.

Under the heading "written settlement agreement" the statute provides that "[i]n the case that a resolution is reached to resolve the complaint at a meeting described in clause (i), the parties shall execute a legally binding agreement . . . ." § 1415(f)(1)(B)(iii). The statute does not specify when this agreement is to be drafted, other than that the drafting is to occur after a "resolution is reached." The "written settlement agreement" is a separate subheading within the "resolution session" subpart of § 1415. Congress' decision to describe the written

12

agreement separate from other requirements of the preliminary meeting indicates that the drafting of the written agreement was not necessarily part of the preliminary meeting. Additionally, the subclause limiting the inclusion of an attorney is under the "preliminary meeting" subheading, but there is not an equivalent prohibition under the "written settlement agreement" subheading.   Thus, Congress structured the statute so that the limit on the inclusion of an attorney would only apply to the "preliminary meeting" and not the "written settlement agreement."   The congressional intent to permit involvement of attorneys in the writing of the settlement agreement is further demonstrated by the requirement that the parties "execute a legally binding agreement," because the assistance of an attorney may be necessary to ensure that the language of the agreement is legally enforceable. § 1415(f)(1)(B)(iii).   Thus, within the resolution session, at some point the preliminary meeting ends and the writing of the settlement agreement begins, but the limitation on inclusion of attorneys ends with the preliminary meeting.

Along with the 2004 amendments to the IDEA, Congress made two new findings: that "[p]arents and schools should be given expanded opportunities to resolve their disagreements in positive and constructive ways," and that "[t]eachers, schools, local educational agencies, and States should be relieved of irrelevant and unnecessary paperwork burdens that do not lead to improved educational outcomes." §§ 1400(c)(8-9); *Schaffer v. Weast*, 126 S. Ct. 528, 535-36 (2005) (summarizing the 2004 amendments).   In relation to the "resolution session" these findings indicate a congressional effort to provide a quicker

and simpler means of resolving disputes under the IDEA.  Unfortunately, that does not resolve the ambiguity about what demarcates the preliminary meeting from the writing of the settlement agreement.

Mr. and Mrs. S. also raise an argument based on the structure of § 1415(f)(1)(B) and a limit on the recovery of attorney fees.[1]  The IDEA allows a court to award attorneys fees to a prevailing party, subject to certain limitations. § 1415(i)(3)(B).  An award of attorney fees may not include fees for attorneys attending the preliminary meeting. § 1415(i)(3)(D)(iii).  Mr. and Mrs. S. submit that this evidences Congress' intent to discourage the parties from including attorneys in the preliminary meeting.  (Mr. and Mrs. S.'s Br. on Underlying Matter 23.)  The Court agrees that § 1415(i)(3)(D)(iii) does evidence such congressional intent, but such intent does not support the Department of Education's interpretation of § 1415(f)(1)(B)(i)(III).  The limitation on attorney fees in § 1415(i)(3)(D)(iii) only applies to § 1415(f)(1)(B)(i), the "preliminary meeting." § 1415(i)(3)(D)(iii).  Section 1415(i)(3)(D)(iii) does not preclude the recovery of attorney

---

[1]As part of the attorney fees argument, Mr. and Mrs. S. also raise a public policy argument about a purported shortage of attorneys in Michigan who handle IDEA related matters and the expense of retaining the available attorneys. (Mr. and Mrs. S.'s Br. on Underlying Matter 22-25.)  While the Court recognizes that a shortage of such attorneys is a matter of concern, there is no suggestion in the text of the statute that Congress acted in consideration of such a shortage.  As such, the purported shortage of attorneys plays no part in the Court's construction of the statute. *See Arlington Cent.*, 126 S. Ct. at 2459 ("We have 'stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253-54 (1992))).

fees for work done pursuant to § 1415(f)(1)(B)(iii), the "written settlement agreement." § 1415(i)(3)(D)(iii). Section 1415(i)(3)(D)(iii) indicates that Congress' intent to discourage attorney participation was only related to the preliminary meeting, but that does not clarify when the preliminary meeting ends.

The analysis of the text has not resolved when the preliminary meeting ends and the involvement of an attorney is permissible in relation to drafting the written settlement agreement. In consideration of this, recourse to the legislative history is permissible. *See In re Comshare Inc. Sec. Litig.*, 183 F.3d at 549.

## D.  Legislative History

The limitation on the participation of attorneys provided by § 1415(f)(1)(B)(i)(III) was in the Senate version of the Bill, but was not in the House version of the Bill. CONF. REP. ON H.R. 1350: J. EXPLANATORY STATEMENT OF THE COMM. CONF., H. CONF. REP. NO. 108-779, at ¶ 216 (2004), *reprinted in* 150 CONG. REC. H9,895-02, H9,948.  The Conference Committee described the difference as follows:

> [t]he Senate amendment, but not the House bill, prevents the LEA from *bringing* an attorney to the preliminary meeting unless the parent brings their attorney. The House bill defines the resolution session as a non-administrative or judicial meeting, and the Senate amendment requires a written agreement to be signed by both parties if agreement is reached, and such agreement is to be enforceable in court.

*Id.* (emphasis added).  This description supports the Court's earlier construction of the statute as limiting the circumstances under which the attorney can be physically present, or the functional equivalent.  For example, if during a preliminary meeting one of the LEA's

15

representatives left every 10 minutes to discuss strategy with the LEA's attorney, then the LEA's attorney was included in the meeting.  Similarly, if the LEA's attorney was listening to the preliminary meeting via telephone, then the LEA's attorney was included in the meeting.

The Petitioners-Appellees contend that the legislative history supports the Department of Education's interpretation.  (Dep't of Educ.'s Br. in Support of Request for Inj. Relief, docket #32, at 8-9; Mr. and Mrs. S.'s Br. on Underlying Matter 14-21.)  The Senate Committee  Health, Education, Labor, and Pensions explained that the "resolution process" was added because:

> [a]lthough it is to be expected that a parent would try to resolve a disagreement with the IEP team before filing a due process complaint, the committee has heard of instances in which a school district learns for the first time that a parent has a problem with the district when it receives a notice of the parent's complaint. When this occurs, the school district has not had the opportunity to resolve the disagreement before going to a due process hearing.  The committee believes that the parties should have a forum to resolve matters in a more informal way before moving to a more adversarial process.  The bill adds a new provision, section (f)(1)(B), to provide this forum.

S. Rep. No. 108-185, at 37-38 (2003).  The House Committee on Education and the Workforce explained that:

> [t]he Committee is clearly concerned about the level of communication that occurs between a parent and the local educational agency when there is a dispute about the services the child is receiving. The Committee feels that parents and local educational agency officials, in most cases, should be able to easily resolve issues when they are brought to the attention of appropriate individuals within the school system. The bill creates a new concept of the resolution session that is intended to improve the communication between parents and school officials, and to help foster greater efforts to resolve

16

> disputes in a timely manner so that the child's interests are best served . . . . At
> that meeting the parent and the school officials should work together to
> determine the nature of the complaint and to work collaboratively to attempt
> to resolve the complaint.

H.R. Rep. 108-77, at 114 (2003).  These excerpts indicate a congressional intent to create an

informal process, but not an overriding concern about the involvement of attorneys.  Thus

an expansive reading of the limitation on the inclusion of attorneys would be inconsistent

with Congress' intent.

Mr. and Mrs. S. also direct the Court to the Senate Committee's description of the

process involved in the resolution session:

> the parent will meet with the IEP team to discuss his or her complaint and the
> specific issues that form the basis of the complaint, and the local educational
> agency shall have an opportunity to resolve the complaint . . . . At the
> resolution session, a representative who has decisionmaking authority on
> behalf of the local educational agency must be in attendance, and the agency
> may not have an attorney present unless the parent is accompanied by an
> attorney or a third party advocate . . . . The committee does not intend that an
> agreement must be reached during the meeting, as parties will often need time
> to consider proposed methods of resolution. Therefore, the local educational
> agency has 15 days from receipt of the complaint to resolve the matter. The
> parties shall memorialize any resolution agreement in a written document that
> is enforceable in court, as is any other written settlement agreement.

S. Rep. No. 108-185, at 38.  With respect to the inclusion of the LEA's attorney this

statement basically repeats the statute verbatim, with two exceptions.  First, the Committee

used the word "present" in place of "include," which supports narrowly constructing

"include" to mean physical presence or the functional equivalent.  Second, the Committee

indicated that the LEA's attorney could be present if the parents have a "third party

17

advocate."[2]  Allowing the inclusion of an LEA's attorney because the parent has a third party

advocate indicates that the Senate Committee intended even narrower limits on attorney

participation than was ultimately adopted.   Moreover, the Committee statement also

recognizes the distinction between the preliminary meeting and the drafting of a written

agreement.

Both the House and the Senate Committees described the purpose of the "resolution

session" as being to increase fairness and to minimize litigation. The Senate Committee

indicated that:

> the goal of these new provisions is fairness: to be sure that a district is aware
> of a problem and has a chance to resolve it in a less formal manner before
> having to spend the time and resources for a due process hearing. The purpose
> is not to make parents go to another IEP meeting to explain an issue that has
> already reached an impasse with the district.

S. Rep. No. 108-185, at 39.  The House Committee also expressed concern that:

> [l]itigation under the Act has taken the less productive track of searching for
> technical violations of the Act by school districts rather than being used to
> protect the substantive rights of children with disabilities. This type of
> litigation breeds an attitude of distrust between the parents and the school
> personnel rather than working cooperatively to find the best education
> placement and services for the child . . . . After a complaint is filed, a
> resolution session gives local educational agencies a 30-day opportunity to
> meet with the parents to address in detail any complaints before a due process
> hearing may occur . . . .

---

[2] The Court is not suggesting that the statute permits the LEA's attorney to be present
if the parents had a "third party advocate." Such a construction would contradict the explicit
text of the statute.  The Court is only discussing the language about the "third party advocate"
to explore Congress' intent with respect to attorneys.

H.R. Rep. 108-77, at 85.  These statements express an intent to provide an informal process in order to decrease the amount of litigation under the IDEA.  The legislative history indicates that Congress limited the inclusion of attorneys to decrease the possibility that the preliminary meeting would become an adversarial proceeding.  Permitting an LEA's attorney to be involved in the drafting of a written settlement agreement is consistent with the legislative history.

### E.  Executive Branch Statements

The Michigan Department of Education and Mr. and Mrs S. also direct the Court to concerns about the cost of IDEA proceedings.  The U.S. Department of Education in promulgating regulations under the IDEA, explained that with regard to "resolution sessions" that:

> because of the high cost of due process hearings and the low expected cost of conducting a resolution session, there would likely be some savings for all parties involved if resolution sessions are relatively successful in resolving disagreements. For example, California reports an average cost of $18,600 for a due process hearing, while Texas reports having spent an average of $9,000 for a hearing officer's services. Anticipating that attorneys will participate in approximately 40 percent of the predicted 3,945 resolution sessions (including drafting legally binding agreements when parties reach agreement), we expect resolution sessions to cost just over twice the average cost of IEP meetings, or approximately $700 per session. Even with a very low success rate (eight percent), given the expected costs of these sessions compared to the high cost of conducting a hearing, all parties involved would likely realize some modest savings.

Assistance to the States for the Education of Children with Disabilities, 70 Fed. Reg. 35,782, 35,822 (June 21, 2005).  While indicating that attorneys will not always draft the agreement,

the U.S. Department of Education statement acknowledges the role of attorneys in drafting the agreements.  Moreover, the statement does not discuss the relationship between the preliminary meeting and the drafting of the agreement, which is the matter before this Court.

Mr. and Mrs. S. also direct the Court to a U.S. Department of Education's Office of Special Education and Rehabilitative Services document titled: "Procedural Safeguards: Mediation and Resolution Sessions."[3] (Mr. and Mrs S. Br. on Underlying Matter 21.)  With respect to the inclusion of attorneys during preliminary meetings, the "Procedural Safeguards" document repeats verbatim the language of § 1415(f)(1)(B)(i)(III). (*Id.* at Ex. D.)

## F.  Ethical Consideration Raised by Mr. and Mrs. S.

Mr. and Mrs. S.  argue that the interpretation of the IDEA offered by Rochester is actually an attempt by Rochester's counsel to "cover-up his failure to comply with Rule[s] 4.1 and 4.3 of [the] Michigan Rules of Professional Conduct." (*Id.* at 26-27.)  Mr. and Mrs. S. did not frame this as an argument under Federal Rule of Civil Procedure 11 and the Court does not construe it as such.  *See* FED. R. CIV. P. 11(c)(1)(A).  The proper forum to raise an alleged violation of the Michigan Rules of Professional Conduct is the Michigan

---

[3]Mr. and Mrs. S. also direct the Court to policy statements from Wisconsin and Minnesota. (Mr. and Mrs S.'s Br. on Underlying Matter 21-22, Exs. E & F.)  These documents could assist the Court in viewing "the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds . . . ." *Arlington Cent.,* 126 S.Ct. at 2459.  While both policy statements reference the limitation of § 1415(f)(1)(B)(i)(III), neither provides much description of the limitation beyond repeating the language of § 1415(f)(1)(B)(i)(III).

Attorney Grievance Commission, not this Court. MICH. CT. R. 9.108(E)(2) (authorizing the Commission to investigate alleged attorney misconduct).

## G.  Application of § 1415(f)(1)(B)(i)(III) to Rochester

Section 1415(f)(1)(B)(i)(III) prohibits a LEA from including an attorney in the preliminary meeting unless the parent is accompanied by an attorney.  The preliminary meeting begins when parent(s) and the LEA's representatives gather to discuss the education of the child.  The LEA's attorney is included if the attorney is physically present or a functional equivalent.  The LEA's attorney may participate in the drafting of the written settlement agreement, but the attorney's involvement should be limited to converting the substantive agreement into a legally enforceable agreement.  If the LEA's attorney was not permitted to attend the preliminary meeting because the parents were not accompanied by counsel, the form of the attorney's involvement in the drafting of the written settlement cannot circumvent that limitation.

The text alone did not provide a way to demarcate between these two-parts of the resolution session, so the Court reviewed the legislative history for that limited purpose.  The legislative history indicates a congressional intent to provide parents and LEAs an opportunity to reach an agreement in a non-adversarial setting.  *E.g.*, H.R. Rep. 108-77, at 114 ("[T]he parent and the school officials should . . . work collaboratively to attempt to resolve the complaint.");  S. Rep. No. 108-185, at 38 ("[T]he parties should have a forum to resolve matters in a more informal way").  Congress' intent to provide a non-adversarial

21

forum to facilitate a quick resolution has been achieved once the parties have a substantive agreement.   The meeting ends when either: (i) the parties reach a substantive agreement regarding the education of the child, or (ii) the parties conclude that an agreement cannot be reached.

The Michigan Department of Education's interpretation of § 1415(f)(1)(B)(i)(III) is inconsistent with the statute.   The Department of Education determined that § 1415(f)(1)(B)(i)(III):

> prohibits the use of an attorney by the district during initiation to completion of a RSM when a parent of an eligible student is not accompanied or represented by an attorney "first" during initiation to completion of an RSM.

(Letter to Dr. John M. Schultz 1.)  First, the Department uses the term "resolution session meeting" or "RSM" which is not found in the text of the statute.  This terms appears to be an amalgamation of two headings in the statute, "resolution session" from § 1415(f)(1)(B) and "preliminary meeting" from § 1415(f)(1)(B)(i).  The amalgamated terms suggest that the limitation on the inclusion of attorneys applies to the entire "resolution session," however the limitation on attorney participation only applies to the "preliminary meeting."  Finally, the word "use" in place of "include" broadens the scope of the limitation beyond what is provided by the statute.  The word "use" in combination with the term "Resolution Session Meeting" indicates a much broader limitation on the LEAs than is imposed by the statute.

Rochester did not violate § 1415(f)(1)(B)(i)(III) on October 25, 2005 during the preliminary meeting with Mr. and Mrs. S.  When the meeting began at approximately

10:00 a.m., Rochester's attorney was neither physically present in the meeting nor did he otherwise participate. The preliminary meeting ended at noon when the parties reached an "initial agreement." After the preliminary meeting had ended Rochester's attorney was permitted to participate in the drafting of the written settlement agreement. The drafting of the written settlement agreement took place between noon and 2:00 p.m. on October 25, 2005.

One final issue relates to the exclusion of "at this time" from the final settlement agreement. The relevant text from the initial agreement typed by Rochester personnel during the preliminary meeting indicated that the parents' request for an independent educational evaluation had been "[w]ithdrawn. At this time. Premature . . . parents may consider this at a later date." (Oakland Schs. Investigation Report of the Compl., Ex. D.) The two initial versions and the final version of the agreement drafted by Rochester's attorney do not have the "at this time" or similar language. (*Id.* at Exs. F-H.) This difference between the initial agreement and the versions drafted by Rochester's attorney does not mean that Rochester's attorney was included in the preliminary meeting. As discussed earlier, the resolution session permits the involvement of an attorney in the drafting of a written settlement agreement. Whenever parties ask an attorney to create a legally enforceable agreement based on the terms outlined by the parties, there is a possibility that the document written by the attorney will fail to fully capture the terms of the agreement. Though there might be circumstances in which the differences between the initial agreement and the document written by the

attorney are an effort to circumvent the limitations on the inclusion of the attorney in the preliminary meeting, this case is not such a circumstance.

IV.

The construction of § 1415(f)(1)(B)(i)(III) by the Michigan Department of Education is inconsistent with the text, structure and legislative history of § 1415(f)(1)(B) and is therefore invalid. The invalidity of the Department of Education's interpretation of § 1415(f)(1)(B)(i)(III) precludes affirming the Department's conclusions or granting the Department's request for injunctive relief. The invalidity of the Department of Education's interpretation of § 1415(f)(1)(B)(i)(III) also precludes the enforcement of the Department's "Corrective Action" and "Proof of Compliance" (Letter to Dr. John M. Schultz 2.), premised on 20 U.S.C. § 1415(f)(1)(B)(i)(III). An order consistent with this opinion will be entered.

Date:    October 2, 2006            /s/ Robert Holmes Bell
                                    ROBERT HOLMES BELL
                                    CHIEF UNITED STATES DISTRICT JUDGE

24